Second case, oral argument this morning. Christopher Frey v. United States Department of Health and Human Services. We'll hear first from Mr. Alan Harris. Thank you, Your Honor. And I'm Alan Harris. I am counsel for Mr. Frey, who is the relator and the whistleblower in this case. And he is here with us today. And Mr. Frey and I greatly appreciate the opportunity to present oral argument to you today. In my time, I'd like to focus on two principal issues. First, how the Department of Health and Human Services got the law wrong on the probation standard under R.S. Section 1553. And second, how HHS is ignoring large portions of evidence, especially countervailing evidence in the record in addressing whether the defendant HMS met its clear and convincing evidence burden of proof, cannot survive substantial evidence review. On the issue of contributing factor causation, it's clear that HHS got one thing right. It confirmed that Mr. Frey had raised with senior management his concerns about what he viewed to be waste and fraud on the part of HMS, affecting billions of dollars. HHS is not in question. Unfortunately, however, in a claim process that should have taken no more than 13 months, but that HHS ended up dragging on for over four years, HHS got little else right. On the contributing factor standard, which case law tells us is it was evident from the report that they issued that HHS was confused about the law. First of all, because they stated a four element test for proving a retaliation case under ARA, a test that does apply under several other federal whistleblower statutes, but the test under ARA is different. It's a three element test. And second, HHS revealed their three times in the report that even though Mr. Frey had proved knowledge of his whistleblowing activities by the company officials responsible for taking reprisals against him, that he was also required to show proximity in time between his disclosures and the acts of reprisal. ARA says that a claimant may use circumstantial evidence to establish contributing factors, including knowledge or proximity in time. The Herrera case, cited in our briefs, indicated that proving either knowledge or proximity in time, based on the wording of the statute, is sufficient to establish the contributing factor standard. In that case, the claimant had the potential to prove proximity in time, but had not proved knowledge. And the court there said that knowledge was acceptable but not necessary evidence. In other words, establishing one of the two alternates was sufficient to demonstrate causation. In our case, the flip side should be true. Proximity in time is acceptable but not necessary evidence. And because we clearly established the other alternative for certain, that is knowledge, we have established the contributing factor. We have satisfied that burden of proof. Incidentally, as our briefs point out, we believe we also showed proximity in time, even though we were not required to do so. And as the Cibolo Water case held that we cite, when statutory elements for proving a claim are stated in the alternative, the claimant may show either one element or the other in order to prove the claim. Now the government, in fact, advocated this same argument that we're advocating today in the Chippewa Cree tribe case before the Ninth Circuit last year, that showing either knowledge or proximity in time was sufficient to establish contributing factor under R. 1553. But now today, the government has switched sides and they're arguing to the contrary. But this type of approach of applying the wrong statutory standard or the wrong statutory language in order to squelch a whistleblower and shield the defendant employer was just the sort of thing that was criticized by none other than former Senator Claire McCaskill, who was the author of R. 1553. And in the context of a Defense Department whistleblower statute, she stated this should not be about protecting defendants. It's about protecting whistleblowers. Moving on to my point about substantial evidence. As we know, once a whistleblower establishes causation under R, under the contributing factor standard, as we believe we've done, it's then up to the defendant employer to determine that it would have taken the same retaliatory actions even if the claimant were not a whistleblower. And we know that this is an intentionally high burden of proof in between a preponderance of the evidence and proof beyond a reasonable doubt. Now, a multibillion dollar company like HMS is probably sophisticated enough not to have a smoking gun memo in its file saying, well, Mr. Frye is a whistleblower, so let's retaliate against him. And so that's why holding HMS to the clear and convincing evidence burden of proof is so important. Wasn't there evidence of performance problems and also he was part of a reduction in force? Your Honor, there was some evidence of performance issues. HHS cited a 2007 performance review of Mr. Frye that they claimed was very critical of his performance. There were also some officers of the company that criticized him, others that praised him. But the 2007 performance review, if you go back and look at it, it's really not all that bad. In fact, in not a single category was he rated fails to meet expectations. In fact, he was rated as exceeding  performance. Well, I thought I read that he was the lowest rated person in his position. Well, Your Honor, I believe what it said is that his supervisor, David Dawson, considered him to be the lowest number three out of the three regional vice presidents that he supervised. There were many regional vice presidents in the company. And basically, how regional vice presidents were rated was based on their revenues. When Mr. Frye first started with the company and had a number of territories, his revenues were out of the park. He was exceeding all revenue projections. When the company started reducing his territories, once he started raising concerns within the company, his revenues that he was responsible for went down. And so that's why Mr. Dawson, I believe, said that he was three out of three, because his just said that when the company had problems, they reduced his area. So that all was caused by those problems. Your Honor, yes, what I'm saying is that because he was raising concerns about what he saw as wrongdoing by the company, that they began taking reprisals against him, which included reducing his territory. And little by little, one by one, they took away his territory. They did a number of other things to retaliate against him that ultimately culminated in his termination. And Judge Winger, you also asked about the reduction in force. That is what the company started to claim about 18 months after he was terminated. And as a matter of fact, even at the time he was terminated, there was no mention of performance issues. At the time he was terminated, he was told, oh, we're just trying to save money. At the time he was terminated, however, the company was still hiring other senior officers and rehiring other senior officers at high salaries. Well, who was being reduced? What type of employees? Well, that's the question, Your Honor. We don't think that they really were being reduced. Because if you look at what the company claimed to be their reduction in force list, which they presented about 18 months after he was terminated, it covers employees of all different levels and all different departments. And case law says that that kind of termination of people is not consistent with a reduction in force. And in fact, it happened over a two-year period of time. It's not something that happened in some more defined shorter period. And we presented significant evidence, such as those factors and others, to HHS to challenge the assertion that the termination was due to a reduction in force. And that's one of the problems that we have with the HHS decision is that the record reflects that they gave almost no consideration to those issues. And that's really odd in light of the fact that after we presented that information, the chief HHS OIG investigator emailed us to say, I think Mr. Frye has raised important points, and I need to follow up with HMS witnesses on these issues. He had a number of interviews with HMS witnesses after that, including a re-interview of the HR chief, Tracy South. But the record reflects that he didn't ask any questions to follow up on those issues, with one small exception. He did ask Ms. South why Mr. Frye was terminated on a Tuesday, which was uncharacteristic of an RIF, instead of at the end of a week, on a Friday, or at the end of a pay period. And she wasn't able to answer the question. So we assert that the claim that his termination was due either to an RIF and or to performance issues was a pretext, because those excuses were not raised or mentioned at the time of his termination. And the company's explanations for his termination changed over time. And there's very little paper trail to establish that there was an RIF. There's a case we cited in our brief that says normally you would expect there to be about an RIF. And there was nothing of any sort that the company produced or that is reflected in the record. And so, because the agency, we believe that the agency just accepted the pat answers of the HMS witnesses, really carte blanche. As you look at the HHS report, there's no analysis of the veracity of their statements versus those of Mr. Frye. There's no attempt to try to address the conflicting information that's in the record and the conflicting claims that are in the record. And so the report leaves this court with no opportunity to assess whether HHS considered all the relevant facts and whether they considered even countervailing evidence and perhaps if they decided, okay, this side is more credible than the other, they didn't say that. We don't know if they went through that sort of assessment. And so the case law says that in those situations, the agency action cannot survive substantial evidence review. And in those situations, the court should vacate the decision and remand it back to HHS for reconsideration following the appropriate statutory guidelines and considering all the relevant facts, not just those that are favorable to the company, but all the relevant facts. As the Whitmore case cited in our brief pointed out, it's important for agencies and courts to protect the interests of whistleblowers because whistleblowers perform an important public service. In this case, Mr. Frye was calling out a company for what he believed to be billions of dollars of waste in the Medicaid system. And so the Whitmore case says that that's why a company such as HMS is held to a high burden of proof. That's why they're held to the clear and convincing evidence standard. They also mention that a whistleblower is usually at a disadvantage because the company holds all the cards in terms of having all the evidence and documentation. And in particular, Mr. Frye couldn't keep any documentation proving his claims because he was ushered out when he was terminated. And so we urge the court to further the interest of a whistleblower here and not let HHS, in its mishandling, we believe, of this case, throw cold water on future whistleblowers because whistleblowers play such an important role in calling out fraud that costs taxpayer dollars. I believe that my, a lot of time is up unless you have further questions and I'll reserve five minutes for rebuttal. Thank you, sir. Thank you, Your Honor. Good morning, Your Honor. It's Janie Lilly for the government. Your Honor, the agency determined that the agency properly dismissed Mr. Frye's whistleblower complaint for two independent reasons. First, the agency concluded that he had not satisfied his burden to show a causal connection between his whistleblowing activity and the adverse employment activity. And the agency also found that the company had shown that it would have terminated him through a reduction in force in the absence of his whistleblowing activity. The petitioner asserts that the agency applied the improper, an improper legal standard and somehow held him to show circumstantial evidence through multiple, through multiple avenues. And the agency's decision and the OIG report confirmed that that's not the case, that the agency acknowledged that Mr. Frye had shown that the employers had knowledge of his whistleblowing activity, but that that knowledge was so outdated that it did not satisfy his burden to show that there was a connection between that activity. And the converse of his argument would demonstrate the correctness of the agency's decision. He would suggest that any evidence of knowledge, no matter how outdated, no matter any other evidence of knowledge, would not satisfy his burden to show that there was a connection between his whistleblowing activity and the adverse employment activity. So what was going on during those years? Was it a continuing whistleblower matter, or had that stopped being considered? Your Honor, are you asking about whether he continually reported additional whistleblowing allegations? Well, just what went on in the, I believe there were four years. Yes, Your Honor, four years. The record reflects that the agency's decision shows that the whistleblowing was his termination. He put various allegations of other adverse employment activities before the agency, and the agency found those to be unsupported in the record and didn't credit those. Well, maybe my question was not clear. I want to know if this gap of time that your client says separated the whistleblowing from the reduction in force, was there continuous dealing with the whistleblower matter up until the time he was fired? The record does not show that there was continuous reporting or evaluation of his whistleblowing activity, I believe. Was he continuing to pursue it? There is not evidence in the record that he was. In fact, with respect to one of the two whistleblowing allegations, he reported it to his supervisor, Mr. Dawson, who did not think that it was an allegation of illegality or abuse, and the activity went no further. And with respect to the other allegation, it was determined that there was no unlawful activity when the agency investigated that activity, if that answers your question, Your Honor. But the agency sensibly and properly took into account Mr. Frye's evidence of knowledge, but found that it was an insufficient basis to satisfy his burden to show that that was a contributing factor in his much later termination. The agency also concluded, as a separate and independent basis for dismissing his whistleblowing complaint, that the employer had shown that it would have terminated him through the reduction in force, even in the absence of his whistleblowing activity. And Mr. Frye suggests that the agency did not credit evidence that was favorable to him, but the OIG report on which the agency's final determination relied summarizes the available evidence, both favorable and unfavorable, and the agency credited the evidence that showed, the consistent evidence that showed that he was terminated through a reduction in force and that he was selected for that reduction in force because of his relatively poor performance. And for those reasons, the agency sensibly determined that, and reasonably determined, that his whistleblower complaint should be dismissed. The petitioner suggests that the agency is somehow taking a different position than it did in the Chippewa Cree tribe case, and that's simply not the case. The agency acknowledges both the importance of whistleblowers, but also the text and the purpose of the whistleblowing retaliation provision that allocates the burden to the complainant to show that causal connection. In the Chippewa Cree tribe case, it acknowledged that it could do so through multiple different means. And here, the complainant was given the opportunity to show through ample evidence of knowledge or through a temporal connection or even direct evidence or some other form of evidence. Well, it's undisputed, I take it, that his employer knew that he'd blown the whistle. Yes, Your Honor, and that is acknowledged in the agency's report. But the agency found that that wasn't enough to carry the burden on these facts, given the length of time that had taken place. And it stands to reason, if he had had a 50-year employment with an employer and had engaged in some whistleblowing activity on day one of his employment, that that would not necessarily satisfy his burden to show a causal connection if he was terminated 50 years later, for instance. And for similar reasons here on the facts of this case, the agency found that he had not satisfied his burden. It seems like there's a lack of concrete facts on both sides. There were facts on... I don't hear much of anything about his poor performance. Well, Your Honor, the agency cited in its investigative report numerous interviews with company officials who confirmed that he was terminated as part of a reduction in force and equally evidenced that the reason he was selected for a reduction in force was that he was among the lower-performing members of his cohort. Where in the record is the best documentation that, number one, there was reduction in force, and, number two, that he was chosen because of his poor performance? Contemporary documentation. I believe the best evidence would be the numerous interviews with company officials who are presumably relying on their contemporaneous understanding of what happened at the time. I'm looking at the summary... how long before the termination or after the termination? It was as part of the Office of Inspector General's investigation of his complaint, so those would necessarily be after the termination. Is there contemporary evidence surrounding the termination, predating the termination, of a reduction in force and why he was chosen? I believe those would be the record of testimonial evidence from those who were involved in the reduction in force. But it was after the fact. I mean, there's no contemporaneous documentation. I don't know that there is any contemporaneous documentation in the record, nor was any required. The agency interviewed a number of officials at the company.  that Mr. Fry was selected for the reduction in force. And so... Let me be more specific. Is there documentation that backed up that testimony? In other words, usually you would think there would be e-mails or memos about a reduction in force and why and who and who's going to be selected. Was there any evidence of that nature? There is the... I think there are two documents that were attached to the report of investigation, one of which was a list of employees who were part of the reduction in force. I don't know that that was not contemporaneous with... exactly contemporaneous with Mr. Fry's termination. But the agency credited the testimony, the consistent testimony, of testimonial evidence of company employees. And when Mr. Fry pointed out questions and raised questions about why he was selected or asserted aberrations in his treatment in the reduction in force, the agency went back to company officials and asked questions about those and then was satisfied with the company's explanation at that point. But the agency's evaluation of the record and weighing of the evidence, its credibility determinations and factual findings, of course, are reviewed deferentially under the Administrative Procedure Act. But in any event, the agency conducted its determination reasonably and we ask the Court to dismiss the petition on that point. Thank you, Ms. Newman. May it please the Court, Alison Ho on behalf of Intervenor HMS. The only way that Mr. Fry can prevail is for this Court to rewrite the statute and reweigh the evidence. And because this Court can do neither, the petition must be denied. Let me start with his first issue on contributing factor. No doubt aware of the narrowness of this Court's review, Mr. Fry has framed his first issue purely as a legal one. He claims that the agency misinterpreted the statute. Respectfully, I would submit that this Court's decision in Pacific Lumber conclusively forecloses Mr. Fry's interpretation of the statute. That case interpreted a materially indistinguishable statute that, like the relevant provisions of the Recovery Act, had the word including and a list of three provisions in that statute separated by the term or. However, this Court held, and I quote, the non-exhaustive nature of the three subsections is inconsistent with treating them as compartmentalized alternatives, close quote. Satisfying just one quote is not necessarily, close quote, enough. That's 584 F. 3rd at 245. The exact same thing is true here. The plain statutory text says that circumstantial evidence may be used to prove contributing factor, and that circumstantial evidence in turn may include knowledge or temporal proximity. While Mr. Fry's reply brief repeatedly refers to this as an either or choice,  further confirming that it would have to be rewritten to make knowledge categorically sufficient in all cases, even if 20 or 30 years passed between the disclosure and the adverse action. So because Mr. Fry's interpretation would require this Court to overrule Pacific Lumber, rewrite the statute, and would lead to absurd results, it must be rejected and the petition has to be denied. Moving on to his second issue, again, we don't think the Court gets to the second issue because we think the petition should be denied because Mr. Fry failed to show contributing factor, but assuming the Court gets to the second issue. Mr. Fry points to a laundry list of things that he says the agency didn't explicitly consider or substantively discuss, but the agency included everything that Mr. Fry complains about either in its attached appendix or in the summaries of witness testimony. Mr. Fry's real complaint is how the agency as fact finder weighed that evidence, but it does not matter if he can point to some other evidence that would confirm his version of events. We're not here on summary judgment. Where all he would need to do is point to a dispute in material facts. The agency has already found the facts, and this Court's narrow role is to determine whether its finding was arbitrary and capricious. And let me just point to, and Judge Owen, in terms of your question about contemporaneous evidence, all of Mr. Fry's supervisors in interviews agreed that he was operationally inefficient. That's document 115, pages 13 through 21. His 2007 review confirms that these concerns weren't post hoc rationalizations, and that's document 55, attachment 4. Mr. Fry's supervisor, Mr. Dawson, who selected him for the RIF, said it made sense to choose Mr. Fry because he was the lowest performing of the three regional vice presidents that Mr. Dawson supervised, and it made the company more efficient to reorganize. That's page 16 through 17 of doc 115. And in terms of contemporaneous evidence, Judge Owen, I would suggest the HR screenshot states the reason for Mr. Fry's termination as staff reduction. That's document 115, page 22. Seven witnesses, Meltzer, Singh, Dawson, Vaughn, Glenn, and Perrin, testified that Mr. Fry was terminated pursuant to a RIF. That's document 115, pages 13 through 21. 107 others were terminated over, and I respectfully have to disagree with my friend, Mr. Harris, it was actually less than a one-year period of time. It was April of 2013 to March of 2014. 107 others were terminated over that period, less than a year, with 28% of those terminated in Mr. Fry's own division of government services. A diverse... What did you say the four supervisors or whoever they were testified to just a moment ago? Yes, they testified both to his poor performance, specifically with respect to operational efficiency. And with respect to the 2000 review, if you look closely at that, you'll note that Mr. Fry received partially meets expectations, which is the second lowest rating in seven categories, one of which included operational efficiency, cost management, expense management. So the 2007 report, I think, is important because it shows that it confirms the testimony of his later supervisors with respect to his operational inefficiency, which is totally consistent with why he was selected for the RIF. And, again, Mr. Fry's own supervisor, one of his supervisors, Ms. Price, was herself terminated pursuant to the RIF after he was. And that's Doc 115, page 20. And, finally, with respect to Mr. Fry being terminated on a Tuesday, 17 other employees who were terminated pursuant to the RIF were also terminated not on a Friday or at the end of the month. And, in fact, 11 other employees who were terminated pursuant to the RIF were fired, just like Mr. Fry was, on a Tuesday. So it's simply not correct to say that, in the record, when Ms. South was asked about why he was terminated on a Tuesday and not some other day, she did not say there was, you know, it was not correct that she didn't have an answer. She said there was no reason on a Tuesday. It all came down to business objectives. And, indeed, the record, and this is all in Doc 116, Attachment 2, I think shows conclusively, I think, that even setting aside this court's deferential review, I think the record amply, amply supports the agency's determination that Mr. Fry was terminated legitimately pursuant to a RIF, selected for the RIF based on consistently poor performance. And so we would ask this court to deny the petition either for that reason or because Mr. Fry failed to carry his burden of proving a contributing factor. Thank you. Thank you, Ms. Harper. Mr. Harris, you have five minutes on the button. Thank you, Your Honor. Counsel for HMS puts a lot of reliance on the Pacific Lumber case. The Pacific Lumber case has nothing to do with meeting a burden of proof. The Pacific Lumber case dealt with whether a plan in bankruptcy should be considered fair and equitable. We think that the Cibolo Waste case, also decided by this circuit, is much more on point because the Cibolo Waste case deals with how something is to be proved. In that case, it was a commerce clause violation. And that case said if the statute says you can prove either this or that, and I'm not putting some, either is my word, but or is in the statute. And so if you prove one or the other, you've met your burden of proof. In our case- How do you answer the absurd result? It could be 10, 15, 20, 30 years. In terms of between the temporal proximity? Well, Your Honor, first of all, we did provide evidence that Mr. Fry continued to be- I'm talking about the statutory construction issue. Oh, and I'm sorry, I'm not sure I understood your question. Under your interpretation of the statute, once the employer has knowledge, it does not matter how long in between the obtaining of that knowledge and the adverse employment action. It's irrelevant. And I'm saying it could be 10, 15, 20, 30 years. Well, that's right, Your Honor. If you took it to that extreme- Isn't that an absurd result? Well, if you took it to that, you could certainly argue that. But that's how the statute was written. And in this case, it was certainly not that long of a- It was four years. It was not- If you look just at his termination, it was four years. I'm just going to add a question of statutory interpretation. It seems to me that the statute is more reasonably interpreted as saying you can use circumstantial evidence, including this or this. It does not seem to say to me that once you show knowledge, that's all you have to show, and temporal proximity is irrelevant. Well, Your Honor, if that were the case, then I think the statute should have said, show this and this. And the Herrera case sided with us on that issue. It said if you showed one, that did the job. And in terms of knowledge, I think once- But does it say that once you show that, temporal proximity is irrelevant? In other words, if it's ten years, you cannot consider that. That's correct, Your Honor. That's the way the statute is written, and so I think it should be applied as written. And I think knowledge is something that doesn't go away. I mean, it was obvious that there were a number of people at HMS that had a grudge against Mr. Frey because of his whistleblowing activities. Grudges don't usually have a statute of limitations, and so perhaps that's one reason why Congress worded the statute in the way that it did. I think that they were trying to make the statute flexible for whistleblowers, and also case law does say we don't think the statute is vague or absurd, but there is case law that says even if a statute would seem to produce absurd results, a court still should resolve all doubt in favor of a whistleblower rather than against the whistleblower. But you also asked Judge Owen about when the interviews took place of the HMS witnesses. That took place 18 months after Mr. Frey's termination. He was terminated in May of 2013, and the interviews with HMS witnesses took place in November of 2014. And there really was, it's true that there really was no contemporaneous documentation. Opposing counsel mentioned the HR screenshot, but we think that's, you know, anybody could put anything in that, but that's the only piece of evidence that anyone can cite that was even arguably contemporaneous. What about the fact that his supervisor was terminated as well? Yes, Your Honor, his supervisor eventually was terminated also. Not at the same time as Mr. Frey, but he was. How long after he was terminated? I don't recall that. I think it was within a year or two, but I don't recall. I apologize. Another important thing to recognize in this case is the importance that opposing counsel and HMS and HHS put on a 2007 performance review. And by the way, there were seven exceeds expectations and seven meets expectations in that review, as well as seven partially meets expectations. But it's a little ironic to go that far back in time. When we told HHS there were more recent performance reviews, they never took the time to try to go find those. It's a little ironic to go that far back in time, much farther back than our four years, and then claim that our four years is too attenuated. It looks like my time is up. Yes, sir. Thank you, Your Honor. Thank you, Mr. Harris.